**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
———————————————————————

**UNITED STATES OF AMERICA**


        **V.**

                                           **3: 07-CR -68**

**CORBIN DOUGLAS, SR.,**
                        **Defendant.**
———————————————————————————

**THOMAS J. McAVOY,**
**Senior United States District Judge**


## DECISION & ORDER

### I.  INTRODUCTION

Defendant Corbin Douglas, Sr. is charged in a ten (10) count indictment with violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 844(a), 859(a), 331(k), 353(b)(1) and 333. See Indictment 07 -CR -68 [dkt. #1].  Presently before the Court is Defendant's omnibus motion seeking to suppress certain statements he made to government officials, and to sever the various counts of the indictment.  The Court heard oral argument on the severance portion of the motion on June 14, 2007, and, on the same date, held a suppression hearing.  The following constitutes the Court's decision on the severance portion of the motion, and the Court's findings of fact and conclusions of law on the suppression portion of the motion.

### II. BACKGROUND

The following is a general background applicable to both issues now before the

Court.  According to Defendant,

> on February 27, 2005 Corbin Douglas, Sr. went into his [14-month-old] son's
> room and found him lying motionless. He picked his son up and rushed to
> the kitchen of his small apartment. There he set his son on the floor and
> called 911. A 911 operator lead him through CPR and within minutes
> Emergency Medical Services were on the scene. Corbin, Jr. was transported
> by ambulance to Fox Memorial Hospital. Corbin, Sr. and the rest of his
> family, who had heard the incident on a scanner, followed close behind. On
> the afternoon of February 27, 2005 Corbin Jr. was pronounced dead.

Def. Mem. L. pp. 3-4.

Within hours after his son's death on February 27, 2005, New York State Police

Investigators Lori Hochdanner and Jamie T. Bell arrived at Fox Memorial Hospital and

conducted an interview of Defendant.   Defendant contends that he "does not recall" being

advised of his right not to speak to the police or being advised of any other rights.

Douglas Decl. ¶ 6.  He gave the police a written statement detailing the events of the day

surrounding his discovery of his child in his crib. See Def. Ex. C; Govt. Ex. 2 at the 6/14/07

hearing.

On February 28, 2005, the Coroner performed an autopsy of the child.  See Def.

Ex. B.  The summary of the autopsy report provides: "This 14 month old infant died

suddenly and unexpectedly, at home.  Postmortem toxicology studies indicated opiate

(morphine) toxicity.  Postmortem radiography disclosed a corner fracture of the left

proximal humerus, most consistent with an inflicted injury (child abuse)."  Id. [1]

Later on February 28, 2005, Douglas was transported by three New York State

---

[1] The "final autopsy diagnoses" indicates: (1) respiratory arrest secondary to opiate toxicity; (2)  urine
postmortem screen positive for opiates and benzodiazepines; quantitative analysis  - morphine 45,000 ng/ml,
hydrocodone 560 ng/ml, olanzepine 150 ng/ml; (4) rare petechial hemorrhages of the thoracic organs; (5)
corner fracture of left proximal humerus, by radiography; (6) congestion of the viscera; (7) fresh superficial
1.5 inch contusion of nape of neck. Def. Ex. B.

Police officers to the New York State Police barracks in Sidney, New York.  Douglas was interviewed for approximately 4 ½ hours.  The interview was video-taped.  At some point during the time that Douglas was at the New York State Police barracks on February 28, 2007, he consented, and then refused, to give a voluntary urine sample.  After the interview Douglas was arrested by the New York State Police and charged with the murder of Corbin, Jr.  He was arraigned during the early morning of March 1, 2005 and remanded to the Otsego County Jail.   While he was at the Otsego County Jail, Defendant was interviewed by Child Protective Services Case Worker Amanda Garrett.

Defendant was indicted and charged in state court with violations of New York State Penal Law §125.25 subdivision 4, Murder in the 2nd Degree, and New York State Penal Law §125.15(1), Manslaughter in the 2nd Degree.   He testified in his own behalf at trial and was acquitted on both charges.

On February 1, 2007, the federal government charged Douglas in a ten count indictment with distribution and possession of various controlled substance.  See Indictment 07-CR-68 [dkt. # 1].  Count 1 charges Defendant with distribution of heroin in and about February 2005 in violation of 21 U.S.C. § 841(a)(1).  Although not alleged in Indictment, the Government contends the distribution alleged in Count 1 was to Defendant's friend, Joshua Richheimer.  The Government further contends that on the date of this distribution to Richheimer, Defendant stole olanzapine, a prescription drug, from Richheimer's wife's pocketbook, and eventually gave the olanzapine to Corbin Jr. as charged in Count 6 (infra).  In reply to the severance portion of the motion, Defendant supplies the Richheimers' testimony from the state court trial which indicates that neither saw Defendant take the olanzapine pills.

3

Count 2 charges Defendant with distribution of morphine in and about February 2005 in violation of 21 U.S.C. § 841(a)(1).  The Government contends that this distribution was to Defendant's then 21-year-old cousin, Kallin Richards.  Richards was the other adult in Defendant's apartment at the time the child died.  Count 3 charges Defendant with distribution of morphine to a minor in and about February 2005 in violation of 21 U.S.C. §§ 859(a) and 841(a)(1).  The distribution was allegedly to Defendant's 14-year-old sister.

Count 4 charges Defendant with distribution of heroin, morphine, oxycodone and hydromorphone to a minor in and about February 2005 in violation of  21 U.S.C. §§ 859(a) and 841(a)(1).  The distribution was allegedly to Defendant's 14-month-old son.  Count 5 charges distribution of morphine and hydromorphone resulting in death in and about February 2005 in violation of  21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  Again, the distribution was allegedly to Defendant's son.   Count 6 charges Defendant with the unlawful distribution of the prescription drug olanzapine in violation of 21 U.S.C. §§ 331(k), 353(b)(1) & 333.   This distribution was also allegedly to Defendant's son.

Count 7 charges distribution of morphine in and about 2002 in violation of 21 U.S.C. § 841(a)(1).  During oral arguments on the severance portion of the motion the Government asserted that this count is based on evidence that Defendant poured liquid morphine into Elicia Longcor's drink without her knowledge.  Elicia Longcor is Defendant's girlfriend and the mother of Defendant's deceased son.

Count 8 charges Defendant with possession of heroin, morphine, oxycodone and hydromorphone in and about February 2005 in violation of  21 U.S.C. §844(a).  Count 9 charges Defendant with possession of heroin, marihuana, 3, 4, methylenedioxymethamphetamine (MDMA, also referred to as ecstasy), morphine,

4

oxycodone, hydromorphone, cocaine, and fentanyl in and about 2004 in violation of 21 U.S.C. §844(a). Count 10 charges Defendant with possession of morphine in and about December of 2002 in violation of 21 U.S.C. §844(a).

## III.  SUPPRESSION - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant moved to suppress (1) his statements made to police at the hospital on February 27, 2005; (2) his statements made to police during the 4 ½ hour interview on February 28, 2005; (3) his refusal to provide a voluntary urine sample on February 28, 2005; and (4) his statements made to Child Protective Services Case Worker Amanda Garrett. At the commencement of the hearing on June 14, 2007, the Government advised that it only intended to offer Defendant's February 27, 2005 statement on its case-in-chief. Therefore, the hearing proceeded only with regard to the February 27, 2005 statements.

Defendant seeks suppression of the February 27, 2005 statements on "Fifth Amendment grounds." Def. Mem . L. p. 7. He asserts that he does not recall being given Miranda warnings, Douglas Decl. ¶ 6, and argues that, "based on his level of education, intelligence and his physical and mental condition hours after his son was pronounced dead[,] he was unable to provide a voluntary statement to State Troopers Hochdanner and Bell." Def. Mem . L. p. 7.

At the hearing, the Government called a single witness - New York State Police Investigator Lori Hochdanner. The Court found Inv. Hochdanner to be a credible witness whose testimony was essentially unrebutted.[2] According to Inv. Hochdanner, she and her

---

[2]The Defendant offered his own declaration in support of the suppression motion. As to the circumstances surrounding the February 27, 2005 interview, he asserts:

(continued...)

partner, New York State Police Investigator Jamie T. Bell, were dispatched to the Fox

Memorial Hospital on February 27, 2005.  Their assignment was to interview Corbin

Douglas, Sr. regarding the events of the day leading up to the death of his child.  Inv.

Hochdanner testified that the assignment was in keeping with the standard practice of the

New York State Police which is to interview individuals who discover a person who died

outside to the presence of a physician.  On February 27, 2005,  Inv. Hochdanner was

unaware that there was a suspicion that the child had died from ingesting morphine, and

she did not believe she was investigating a crime.  Neither Inv. Hochdanner nor Inv. Bell

were assigned to interview other family members of the deceased.

Upon arrival to the hospital, Inv. Hochdanner asked Defendant if he would sit down

and speak to her and Inv. Bell about the events of the day.  Defendant agreed.  Inv.

Hochdanner also asked a supervising nurse from Fox Memorial Hospital to sit in on the

interview as an advocate and as a representative of the hospital.  Defendant, Inv.

Hochdanner, Inv. Bell, and the supervising nurse went to a private room in the hospital for

purposes of the interview.

Inv. Hochdanner did not consider Douglas to be under arrest at the time, and

Douglas was never told that he could not leave if he wanted to.  Because Inv. Hochdanner

---

[2](...continued)

4.  Within hours after my son's death, New York State Troopers Laurie [*sic*] Hochdanner and
Jamie T. Bell arrived at Fox Memorial Hospital and interviewed me in the "grieving room" of
the hospital.

5.  I did not request to speak to them as this time.  I was grieving the death of my only son.

6.  I do not recall ever being advised of my right not to talk to the troopers or being advised of any
rights at any time prior to this interview.

Douglas Dec;. ¶ 4-6.  These assertions, however, do not contradict anything testified by Inv.  Hochdanner.

did not believe she was investigating a crime, and thus did not consider Douglas to be a suspect in a crime, she did not administer <u>Miranda</u> warnings.  Inv. Hochdanner further testified that standard New York State Police practice does not allow third persons to be present during questioning of persons who are under arrest and being questioned about a crime.  Douglas never asked to leave the interview which, in total, lasted about an hour.

Although Douglas was understandably upset following the loss of his son, he did not appear to Inv. Hochdanner to be so distraught that he could not understand the questions or respond appropriately thereto.  During the interview, Inv. Hochdanner asked Douglas to recount the events of the day surrounding the discovery of his son.  Based on Douglas's responses, Inv. Hochdanner prepared a handwritten statement for Douglas.  Inv. Hochdanner gave the statement to Douglas who reviewed it for accuracy.  Douglas asked to make two changes, which he initialed, and then signed the statement.  The statement is in narrative form and recounts the events of February 27, 2005 relative to the child. <u>See</u> Govt. Ex. 2.

Defendant attests in the statement that he gave the child three bottles of milk on February 27, 2005 - one at 8:00 A.M., one at 10:00 A.M., and one at noon.  <u>Id.</u>  After giving the child the third bottle of milk, the child fell asleep in his crib and Defendant fell asleep watching television in his living room.  <u>Id.</u>  When Defendant woke up and checked on the child, he found the child "laying face down in the blankets."  <u>Id.</u>  Defendant "grabbed [the child], took him to the livingroom, put him on the floor & called 911."  <u>Id.</u>  The 911 operator instructed on how to perform C.P.R., which Defendant performed until the ambulance crew arrived. <u>Id.</u>

The Fifth Amendment bars the use of statements elicited as the product of custodial

7

interrogation. Miranda v. Arizona, 384 U.S. 436, 467 (1966).  Miranda warnings are not

required when an individual is not interrogated by the police or is not in custody. See

Rhode Island v. Innis, 446 U.S. 291, 300-02 (1980); Beckwith v. United States, 425 U.S.

341, 345-46 (1976).

Interrogation for Miranda purposes is "express questioning or its functional

equivalent." Innis, 446 U.S. at 300-01. The functional equivalent of interrogation is "any

words or actions . . . that the police should know are reasonably likely to elicit an

incriminating response," id., at 301, and "to produce psychological pressures that will

subject the individual to the 'will' of his examiner." United States v. Morales, 834 F.2d 35,

38 (2d Cir. 1987) (citations omitted). While this definition focuses on the perceptions of the

suspect rather than the intent of the police, interrogation also "must reflect a measure of

compulsion above and beyond that inherent in custody itself." Innis, at 301.

A defendant is "in custody" for Miranda purposes when "a reasonable person in

defendant's position would have understood himself to be subject to the restraints

comparable with a formal arrest." United States v. Newton, 369 F.3d 659, 670-71 (2d Cir.

2004); see United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995).  To make a

determination of whether a person is in custody, the Court considers the circumstances

surrounding the interaction with police including: "whether a suspect is or is not told that

she is free to leave; the location and atmosphere of the interrogation; the language and

tone used by the police; whether the suspect is searched, frisked, or patted down; and the

length of the interrogation." Tankleff v. Senkowski, 135 F.3d 235, 243-44 (2d Cir.

1998)(internal citations omitted).

> The Second Circuit has held that custodial interrogation exists
>
> when a law enforcement officer questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak, ... and (2) when the inquiry is conducted by officers who are aware of the potentially incriminating nature of the disclosures sought.

Morales, 834 F.2d at 38  (citations omitted).

Here, there is no evidence that Douglas was subjected to interrogation or its functional equivalent on February 27, 2005.   Douglas was asked questions about the events of the day leading up to and surrounding his discovery of his child but, at the time, there was no suspicion by police that a crime had been committed.  Thus, there is no basis upon which to conclude that the officers sought disclosures which they believed were potentially incriminating in nature. The fact that Douglas's answers might later be deemed to be incriminating, such as after it was discovered that the infant had morphine in his urine, does not change the fact that no such suspicion existed at the time the disclosures were sought.  Further, there is no indication that the police pressured Douglas in any manner to give answers to the questions presented, or that they challenged his answers which recounted what, at the time, appeared to be innocuous behavior by Douglas on February 27, 2005.  See Govt. Ex. 2.

Assuming, *arguendo,* that it could be concluded that the police interrogated Douglas at the hospital, he was not in custody.  The Court credits Inv. Hochdanner's testimony that Defendant was asked, and freely agreed, to speak with the New York State Investigators. Defendant was not searched, frisked, or patted down and there is no indication that the State Police investigators made any statements or took any action that would lead a reasonable person in Defendant's position to believe that he was not free to leave the

9

interview.  The interview, which lasted about an hour including the time it took to prepare and revise the statement, was not exceedingly long and, while conducted in a private room, was not conducted at the police station or in some other location that evinces police dominion or control.  The presence of the nurse supervisor during the interview lends further support to the conclusion that the interview was not conducted in a coercive setting or atmosphere that would have led a reasonable to believe that he was not free to leave.  Therefore, to the extent Defendant's suppression motion is based on the lack of <u>Miranda</u> warnings, the motion is denied.

To the extent the motion is based upon a due process argument that Defendant made an involuntary confession on February 27, 2005, <u>see</u> <u>United States v. Orlandez-Gamboa</u>, 320 F.3d 328, 332 (2d Cir. 2003)("A confession is admissible under the Constitution only if it is made voluntarily.  [T]his principle and its elaboration have been deemed to be due variously to the Due Process clause and the Fifth Amendment right against self-incrimination . . . .");  <u>United States v. Venkataram</u>, 2007 WL 102102, at *16 (S.D.N.Y. Jan. 10, 2007),[3] the motion must also be denied.

_____

[3]As explained by the Southern District in  <u>Venkataram</u>:

A confession is "involuntary" if it is obtained by "'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'"  <u>Oregon v. Elstad</u>, 470 U.S. 298, 304 (1985)(quoting <u>Haynes v. Washington</u>, 373 U.S. 503, 515 (1963)); <u>see</u> <u>Miller v. Fenton</u>, 474 U.S. 104 (1985). Voluntariness is "interrelated, but analytically distinct" from the question whether a defendant was subject to custodial interrogation for the purposes of <u>Miranda</u>. <u>See</u> <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 242 (2d Cir. 1998). The fact that a defendant is not in "custody" for <u>Miranda</u> does not foreclose a challenge to a confession as not voluntary. <u>See</u> <u>Beckwith v. United States</u>, 425 U.S. 341, 347-48 (1976). The burden is on the government to prove that a confession is voluntary by a preponderance of the evidence. <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986).

2007 WL 102102, at *16.

"No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." Green v. Scully, 850 F.2d 894, 901 (2d Cir. 1988); see Schneckloth v. Bustmonte, 412 U.S. 218, 226 (1973). The totality of the surrounding circumstances are evaluated "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined.'" United States v. Kaba, 999 F.2d 47, 51 (2d Cir. 1993) (quoting United States v. Guarno, 819 F.2d 28, 30 (2d Cir. 1987)). "The factors to be considered include 'the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." United States v. Alvarado, 882 F.2d 645, 649 (2d Cir. 1989) (quoting United States v. Mast, 735 F.2d 745, 749 (2d Cir.1984)). The only "necessary predicate to the finding that a confession is not 'voluntary' ' is "coercive police activity." [Colorado v. Connelly, 479 U.S. 157, 167 (1986)].

Venkataram, 2007 WL 102102, at *16.

There is no basis upon to conclude that the police extracted an involuntary confession from Defendant by "'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" Oregon v. Elstad, 470 U.S. 298, 304 (1985).   First, there is no indication that Douglas confessed to anything on February 27, 2005.  As indicated above, he recounted what otherwise appeared be innocuous behavior on the day he discovered his lifeless child.  Second, there is no evidence of coercive police activity on February 27, 2005.  Third, there is no evidence that Defendant's mental or emotional state, or level of education and background, was such that he was unable to voluntarily interact with police or that the police overcame his will.  Rather, the evidence indicates that Defendant, while emotional after the loss of his son, was not so distraught that he could not understand and appropriately respond to the questions presented to him.  Defendant has attested that he has a 9th grade education and received his General Equivalency Diploma.  See Douglas

11

Decl. ¶ 2.  As evidenced by the fact that he read the prepared statement and asked for certain revisions, he was cognitively and emotional capable of understanding both what was asked of him and what he was telling the police.

The Court finds no evidence to support the proposition that the conduct of the New York State Police investigators on February 27, 2005 was such as to overbear Defendant's will to resist and bring about a confession not freely self-determined.  Therefore, Defendant's motion to suppress his statements from this date is denied.

## IV.  SEVERANCE - DISCUSSION

Defendant argues that there are three categories of counts in the Indictment consisting of: Counts 4, 5 & 6, which Defendant calls the main counts; Counts 2, 3, & 8, which Defendant refers to as the "unrelated recent counts,"  and Counts 1, 7, 9, & 10, which Defendant refers to as the "unrelated distant counts."  He argues that these 3 categories of counts are not properly joined under Fed. R. Crim. Proc. 8(a) or, if they are properly joined, he is unfairly prejudiced by joinder of the main counts with the others and should be severed under Fed. R. Crim. P. 14(a).

The Government opposes the motion, arguing:

This 10 count indictment charges a drug dealer, that being defendant Douglas, with distribution of controlled substances and possession of controlled substances.  . . .  Defendant Douglas distributed controlled substances to two different minors, that being, his teenage sister . . . and his now deceased 14 month old infant son Corbin Douglas, Jr.  In fact, defendant Douglas distributed the same type of controlled substance, morphine, to both his sister (charged in count 3) as he did to his deceased son (charged in counts 4 and 5).  Furthermore, defendant distributed that same type of controlled substance, morphine, to both his cousin Kallin Richards (charged in count 2) and to his girlfriend Elicia  Longcor, who is also the mother of his deceased son (charged in count 7).  Defendant Douglas also used and possessed for his own use the very same type of controlled substances that he distributed.  The same controlled substance, morphine, which defendant

12

Douglas distributed and as charged in counts 2, 3, 4, 5, and 7 is the same type of controlled substance that defendant possessed and used as charged in counts 8, 9, and 10.  All the evidence will show that the controlled substance, morphine, which defendant distributed or possessed as charged in counts 2,  3, 4, 5, 7, 8, 9, & 10, defendant acquired that morphine from the same source of supply, in the same manner, and from the same residence/location.  The evidence to be presented and the witnesses to be called to prove these facts are identical for each of counts 2, 3, 4, 5, 7, 8, 9, & 10.

Govt. Mem. L. p. 10-11.

The Government also asserts that there is an evidentiary connection between Counts 1 and 6 in that the Government believes the evidence will demonstrate that Defendant obtained the olanzapine he purportedly gave to his son, as charged in Count 6, while he was distributing heroin to another, as charged in Count 1.

On June 14, 2007, the Court ruled from the bench that all 10 counts are properly joined under Fed. R. Crim. Proc. 8(a).  The Court assumes familiarity with that decision.

Federal Rule of Criminal Procedure 14(a) allows for severance of properly joined counts if joinder "appears to prejudice the defendant."  In order to prevail on a motion under Rule 14, "the defendant must show not simply some prejudice but *substantial* prejudice." United States v. Sampson, 385 F.3d 183, 190 (2d Cir. 2004)(quoting United States v. Werner, 620 F.2d 922, 928 (2d Cir. 1980))(emphasis in original).  As the Second Circuit explained in Werner: "[g]ranting separate trials under Rule 14 simply on a showing of some adverse effect, particularly solely the adverse effect of being tried for two crimes rather than one, would reject the balance struck in Rule 8(a), since this type of 'prejudice' will exist in any Rule 8(a) case."  Werner, 620 F.2d at 929.

The danger that Rule 14 authorizes a district judge to cure is not merely that the jury will think worse of a defendant charged with two crimes rather than one, but that the jury will use the evidence cumulatively. See Werner, 620

13

> F.2d at 929. Where, however, "the accused's conduct on several separate occasions can properly be examined in detail, the objection disappears, and the only consideration is whether the trial as a whole may not become too confused for the jury." Id. at 926 (citation omitted). . . [T]he Court may presume that the jury is capable of understanding and following limiting instructions provided during the course of and at the conclusion of the trial with regard to the manner in which it may use evidence. Richardson v. Marsh, 481 U.S. 200, 211 (1987).

United States v. Smith, 2007 WL 980431, at * 3 (S.D.N.Y. April 3, 2007); see also United States v. Josephberg, 2005 WL 1979164, at *5 (S.D.N.Y. 2005)(Curative instructions to the jury can be used to ensure that a defendant is not prejudiced unduly on one count from the presentation of evidence on another.).  Thus, a defendant carries a heavy burden of showing that joinder will result in substantial prejudice. United States v. Amato, 15 F.3d 230, 237 (2d Cir. 1994).

However, "'[p]rejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence.'" Sampson, 385 F.3d at 191 (quoting Cross v. United States, 335 F.2d 987, 989 (D.C. Cir. 1964)).

> [B]ecause of the unfavorable appearance of testifying on one charge while remaining silent on another, and the consequent pressure to testify as to all or none, the defendant may be confronted with a dilemma:  whether, by remaining silent, to lose the benefit of vital testimony on one count, rather than risk the prejudice (as to either or both counts) that would result from testifying on the other.

Id. (quoting Baker v. United States, 401 F.2d 958, 976  (D.C. Cir.1968)).

Nonetheless, "a mere unexplicated assertion" of the desire to testify on only one or a few counts is not enough to require severance.  Id. (quoting Werner, 620 F.2d at 930). "This is especially true where evidence of one crime would have been admissible at a trial

14

of the other crime." <u>United States v. Watts</u>, 2005 WL 2738948, at * 3 (S.D.N.Y. Oct. 1,

2005)(citing <u>Werner</u>, 620 F.2d at 930).  The need for a severance does not exist "'until the

defendant makes a convincing showing that he has both important testimony to give

concerning one count and strong need to refrain from testifying on the other.'"  <u>Werner</u>,

620 F.2d at 930 (quoting <u>Baker</u>, 401 F.2d at 977).  Severance is not warranted "merely

because [Defendant] may have a better chance of acquittal in separate trials."  <u>Zafiro v.

United States</u>, 506 U.S. 534, 540 (1993).

In the instant case, Defendant asserts that he wishes to testify as to Counts 4, 5,

and 6 and deny, as he did in state court, that he gave his son controlled substances.  He

argues that the Government's evidence on these counts is weak, and that his testimony is

essential to his defense.  He recognizes, however, that the Government may have strong

evidence to support the allegations that he distributed controlled substances to his sister

and cousin.  He fears that if he testifies as to Counts 4, 5, and 6 and denies giving his son

controlled substances, the evidence supporting these distribution counts will make his

testimony regarding his conduct toward his son "less credible."  He also argues that the

evidence supporting the allegations from 2002 and 2004 is from vindictive members of the

family of the mother of his child, and he contends that the evidence will be unbelievable to

the jury.  He asserts that he would choose to remain silent on those counts if tried

separately.

While the counts involving distribution and possession of drugs in 2002 (Counts 7 &

10) and 2004 (Count 9) might be distinct in time from the remainder of the counts, crediting

the Government's proffer of evidence leads to the conclusion that they are not distinct in

15

place or evidence. See Sampson  385 F.3d at 191 (Severance may be appropriated if "[p]rejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence.").  Further, Defendant has not made a convincing showing that he has both important testimony to give concerning one set of counts and a strong need to refrain from testifying on the others.  Despite that he might appear to be "more credible" in denying that he gave his son controlled substances if the jury does not hear the evidence underlying the other counts, evidence underlying counts 1, 2, 3, 7, 8, 9, and 10 is probative of the charges in counts 4, 5, and 6.  In this regard, the evidence tends to establish that Defendant had access to the particular drugs alleged to have been found in the child's system post-mortem, and evidence underlying each of the counts is admissible as to the others as part of the *res gestae* of the crimes allegedly committed.

Further, the evidence underlying Counts 1, 2, 3, 8, 9 & 10  would be admissible in the trial of Counts 4, 5, and 6 even if tried separately.   Under Rule 404(b), the evidence of Defendant's possession and distribution morphine, the same drug that was purportedly found in his son's urine, would be admissible to show that Defendant had the opportunity to administer the drug to his son, knowledge of the effects of the drug, and, perhaps, absence of mistake or accident as to what the drug was or would do if ingested. See Fed. R. Evid. 404(b); see also 1 Wigmore, Evidence § 131 at 563 (3rd ed. 1940);[4]  22 C. Wright & K.

---

[4] Wigmore wrote about opportunity:

When an act is done, and a particular person is alleged to have done it (not through an agent but personally), it is obvious that his physical presence, within a proper range of time and place, forms one step on the way to the belief that he did it. It is true that another person may have done it, but the former is at least within the limited number of persons who could have

(continued...)

Graham, Federal Practice & Procedure: Evidence § 5241 (Westlaw 2007)("It seems likely . . . that the word [opportunity in Rule 404(b)] is intended to cover all or part of a category that Wigmore called 'capacity.'  By this he meant the person's physical or mental ability to perform the act in question.");  United States v. Scott, 270 F.3d 30, 47 (1st Cir. 2001)("The evidence was relevant and admissible under Rule 404(b) because it showed [the defendant's] opportunity to make withdrawals from the bank account, which linked him to the fraudulent tax returns."), cert. denied 535 U.S. 1007(2002); United States v. Maravilla, 907 F.2d 216, 222 (1st Cir. 1990)("To show 'opportunity' is to show that the defendant had some special capacity, ability or knowledge that would enable him to commit the crime.").

Likewise, the evidence underlying the distribution of heroin charged in Count 1 provides some evidence of opportunity as to the allegation that Defendant distributed olanzipine to his son as charged in Count 6.  Evidence underlying the distribution counts might also be admissible on the possession counts if tired separately in order to establish knowledge and intent, see United States v. Paulino, 445 F.3d 211, 222 (2d Cir. 2006) ("As this court has long recognized, a defendant's knowledge and intent are crucial to determining whether he exercised constructive possession over an item: 'Constructive possession exists when a person ... *knowingly* has the power and the *intention* at a given time to exercise dominion and control over an object, either directly or through others.'")(quoting United States v. Gordils, 982 F.2d 64, 71 (2d Cir. 1992)); id. at 223 (Upholding admission of prior conviction for crack sale in cocaine possession case since "cocaine is the raw material from which

---

[4](...continued)

done it, and thus is fit to become a subject for further investigation. ... The circumstances involving opportunity will of course vary with the facts of each case . . . .

crack derives," the "retail distribution of crack was probative of [defendant's knowing and intentional constructive possession of the cocaine in his closet because the prior crack dealing . . . indicated that [defendant's] cocaine possession was part of knowing and intentional involvement in an earlier stage in the drug trafficking process."), and *vice versa*.

Under these circumstances, the Court finds that Defendant has not demonstrated that he will suffer substantial prejudice if the counts are not severed.  Any danger that evidence associated with one charge will be used by the jury improperly in connection with another charge can be addressed through cautionary instructions.  Accordingly, that portion of Defendant's motion seeking severance is denied.  See United States v. Harwood, 998 F.2d 91, 95 (2d Cir. 1993)(severance motions are committed to the sound discretion of the district court).

## V. CONCLUSION

For the reasons set forth above, Defendant's omnibus motion is, in all respects, **DENIED**.


**IT IS SO ORDERED**.

DATED:   July 11, 2007

Thomas J. McAvoy
Senior, U.S. District Judge

18