UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

       v.                            07-cr-068

CORBIN DOUGLAS, SR.,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## <u>DECISION and ORDER</u>

Defendant Corbin Douglas, Sr. was charged in a ten count Indictment.  Defendant was charged with seven counts of distribution of a controlled substance (Counts 1 - 7) and three counts of possession of a controlled substance (Counts 8 - 10).  On August 16, 2007, Defendant was convicted on all counts except for Count 7.  Defendant now moves pursuant to Fed. R. Crim. P. 29 seeking a judgment of acquittal and pursuant to Fed. R. Crim. p. 33 seeking a new trial.

## I.      STANDARD OF REVIEW

Defendant moves for judgment of acquittal pursuant to FED. R. CRIM. P. 29 asserting that the trial evidence was insufficient as a matter of law to support the jury's guilty verdict.  <u>See</u> FED. R. CRIM. P. 29(c).  On such motions, the Court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>United States v. Espaillet</u>, 380 F.3d 713, 718 (2d Cir. 2004)(quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979)).

"[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003). In this regard, the Court must avoid substituting its own determination of the weight of the evidence presented and the reasonable inferences that may be drawn from that evidence. Id. "Indeed, it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." Id. The Court must "credit[ ] every inference that the jury might have drawn in favor of the government," United States v. Temple, 447 F.3d 130, 136-37 (2d Cir. 2006), and resolve "all issues of credibility in favor of the jury's verdict." United States v. Desena, 260 F.3d 150, 154 (2d Cir. 2001); see also United States v. Florez, 447 F.3d 145, 154-155 (2d Cir. 2006)("In assessing sufficiency, we are obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court."). The Court must "bear in mind that the jury's verdict may rest entirely on circumstantial evidence." United States v. Jackson, 335 F.3d at 180 (internal quotation marks and citation omitted).

Although a defendant's burden on such a motion is not insurmountable, a judgment of acquittal will only be granted if "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Cassese, 428 F.3d 92, 98 (2d Cir. 2005). Put another way, a Rule 29 motion must be denied if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Temple, 447 F.3d at 136 (emphasis in original).

Rule 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  This rule

> by its terms gives the trial court broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.  The district court must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury.  Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.  An example of exceptional circumstances is where testimony is patently incredible or defies physical realities, although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief.

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.  The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict.  The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.  There must be a real concern that an innocent person may have been convicted.  Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir. 2001)(internal quotation marks and citations omitted).

## II.    DISCUSSION

### a.    Count One - Distribution of Heroin

Defendant moves for relief on Count One essentially claiming that the government witnesses (admitted drug users) were unreliable and that the testimony of the three witnesses who testified regarding this Count was inconsistent.  The issues raised by Defendant pertains primarily to issues of credibility.  Such issues are within the province of the jury.  For example, the jury was entitled to credit the testimony of Chelsea Richheimer

who testified that, approximately one week before the death of Corbin Douglas, Jr., she went to Defendant's house to purchase heroin from Jimmy Loncor, Jimmy Loncor was not present at the time Chelsea Richheimer arrived at Defendant's home, Chelsea Richheimer inquired of Defendant whether he knew where she could find heroin, and Defendant responded by selling a bag of heroin to Chelsea Richheimer for $20.00. Tr. at 614-16. This testimony establishes the elements of the charged offense. Based on the Court's own familiarity with the trial and the testimony of Chelsea Ricchheimer, the Court finds that her testimony was not so untrustworthy as to warrant Rule 29 or Rule 33 relief.

### b. Counts Two (Distribution of Morphine) and Three (Distribution of Morphine to a Minor)

Defendant moves to dismiss Counts Two and Three on the ground that there is insufficient evidence that he distributed the morphine. It is Defendant's contention that, because he, Kallin Richards, and Gillian Douglas used the drugs jointly with the intent to share it amongst themselves, they cannot be found guilty of possessing with the intent to distribute. See United States v. Swiderski, 548 F.2d 445, 447 (2d Cir. 1977).

At Defendant's request, the Court instructed the jury on the issue of joint possession. Defendant also argued this point to the jury. The jury apparently rejected Defendant's contention that the three individuals jointly obtained the morphine with the intent to share it amongst themselves. Although all three individuals were present when the drugs were obtained, there was a factual basis for the jury to reasonably conclude that the drugs were not obtained jointly and, therefore, that this case falls outside the holding in Swiderski. The jury could reasonably have come to this conclusion by rejecting Gillian Douglas' trial testimony and, instead, crediting her prior sworn testimony wherein she stated that

Defendant stole 24 morphine pills from their mother and then gave two to Gillian and six to their cousin, Kallin Richards.  Such a conclusion is supported by the trial testimony of Kallin Richards, who testified that it was Defendant who offered that "he can get some pills," Tr. at 760, that Richards had never taken morphine before, that Defendant obtained "a lot" of pills from his mother's dresser, Tr. at 760-62, and that Defendant "gave me some and he gave his sister some and the rest went in the pocket."  Tr. at 762.  Richards further testified that he obtained the morphine from Defendant.  Tr. at 845.[1]

Based on this testimony, the jury reasonably could have concluded that the drugs were obtained solely by Defendant (and, thus, that Richards, Gillian Douglas, and Defendant did not jointly acquire the morphine).  Specifically, it could reasonably be concluded from this evidence that there was not a joint intent to acquire morphine, that Defendant acquired the morphine himself, that Defendant provided some of the morphine to Richards and Gillian Douglas, and that Defendant retained the remainder for his own personal use at a later time or, possibly, to distribute to others.  Based on the quantity of the pills taken ("a lot"), the jury could reasonably have concluded that Defendant intended to distribute the pills to other persons.  This evidence was further corroborated by the evidence before the jury that, in a prior proceeding, Defendant himself testified that he obtained the morphine from his mother.  These fact distinguish this case from <u>Swiderski</u> and provided a basis upon which the jury could reasonably have concluded that Defendant distributed the morphine to Richards and

---

[1] At trial, Richards was asked the following question and gave the following answer:

Q.     And it's morphine that Corbin Douglas gave to you, is that what you're saying?

A.     Yes.

his minor sister, Gillian Douglas.  The Court, therefore, find no basis for post-trial relief on these Counts.

> **c.** **Counts Four (Distribution of Heroin, Morphine, Oxycodone, and Hydromorphone to a Minor) and Five (Distribution of Morphine and Hydromorphone Resulting in Death)**

Defendant moves for a judgment of acquittal or a new trial on Counts Four and Five contending that there was "no evidence . . . presented either directly or circumstantially to establish how any controlled substance got into or on the child [Corbin Douglas, Jr.]."  Def.'s Mem. of Law at 14.  Defendant contends that the testimony of Kallin Richards was completely fabricated and that the prosecutor relied upon unsupported inferences, conjecture and speculation.

The prosecution responds that there was ample circumstantial evidence upon which the jury could reasonably have concluded beyond a reasonable doubt that Defendant distributed the drugs to his son.  These facts include: (1) heroin, morphine, oxycodone, hydromorphone, and olanzapine were found in Corbin Douglas, Jr.'s bodily fluids and/or tissues; (2) Corbin Douglas, Jr. died as a result of an overdose of morphine; (3) there was overwhelming evidence that Defendant had access to, and routinely possessed, acquired and consumed morphine, oxycodone, and hydromorphone in and around the time of Corbin Douglas, Jr.'s death; (4) Defendant admitted that he was the primary caretaker of, and the only person who prepared the bottles for, Corbin Douglas, Jr.; (5) Defendant admitted that, during the days leading up to Corbin Douglas, Jr.'s death, only he and Elicia Longor fed the baby; (6) two days prior to Corbin Douglas, Jr.'s death, Defendant obtained a large quantity of morphine from his mother's house; and (7) Defendant admitted that, on the day of Corbin Douglas, Jr.'s death, he fed the baby bottles at 8:00 a.m., 10:00 a.m., and at noon.  The

government argues that, in addition to the foregoing evidence, Kallin Richards testified that, on Sunday morning, he observed Defendant pour something from a little white bottle (the same type of bottle in which the evidence demonstrated that the liquid morphine was kept) into Corbin Douglas, Jr.'s baby bottle, and that, at the hospital, Defendant stated to Elicia Longcor "I'm sorry, I'm sorry, I did this." The government further contends that there was circumstantial evidence of motive and opportunity - that Defendant was an unemployed drug user who was responsible for caring for a fourteen month old child and Defendant spent his days at home getting high on the very types of drugs found in the baby. The government further suggests that Corbin Douglas, Jr. suffered from a potentially painful fractured arm that may have given Defendant reason to try to "comfort" the baby.

Even excluding the testimony of Richards, the seven points set forth above, all of which are supported by the record evidence, provide a sufficient basis upon which a jury could reasonably conclude beyond a reasonable doubt that Defendant distributed the drugs to his son, which drugs resulted in the death of his son. Further supporting this conclusion is evidence suggesting that it was Defendant, and not Kallin Richards, who had ready access to, and was a user of, morphine. Accordingly, the Court sees no basis for affording Defendant the requested relief on these Counts.

**d.      Count Six (Distribution of Olanzapine)**

Defendant seeks dismissal of Count Six on the ground that the government failed to prove that Defendant ever came into possession of Olanzapine. Defendant claims that the government's theory - that Defendant stole the Olanzapine from the purse of Chelsea Riccheimer - is unsupported by the evidence. The government responds that it introduced evidence that Joshua Riccheimer was taking Olanzapine, Chelsea Riccheimer (Joshua

Riccheimer's spouse) was carrying the Olanzapine in her purse on the day that she and Joshua went to Defendant's house to purchase heroin, and two weeks thereafter Chelsea and Joshua noticed that several Olanzapine pills were missing because Joshua ran out of his pills earlier than expected.

The Court agrees with Defendant that the evidence in support of this claim is tenuous at best and warrants relief pursuant to Rule 29. The Court can understand how the jury could infer that Defendant is responsible because there was a source for the Olanzapine (Joshua Reiccheimer) and Olanzapine was found in Corbin Douglas, Jr.'s body. The jury likely inferred from this that Defendant was responsible.

While the Court finds that it is more likely than not that Defendant is responsible, it cannot be said that the essential elements have been established beyond a reasonable doubt. There are too many leaps that must be made to support this conviction, even on the basis of circumstantial evidence. To convict Defendant on this Count, the jury would have to have concluded that: (1) Defendant was aware that Joshua Reiccheimer took Olanzapine; (2) Defendant was aware that Chelsea Reiccheimer carried the Olanzapine in her purse; (3) Chelsea Reiccheimer carried the Olanzapine in her purse on the date Chelsea and Joshua Reiccheimer came looking to purchase heroin; (4) Douglas had access to Chelsea Reiccheimer's purse; (5) Douglas had an opportunity to remove the Olanzapine from Chelsea Reiccheimer's purse; (6) there actually were missing pills; (7) the likely explanation for the claimed missing pills is that Defendant stole them (rather than the pills being misplaced, abused by Chelsea or Joshua Reiccheimer, or the prescription simply running low); and (8) Defendant administered the Olanzapine to Corbin Douglas, Jr. Few, if any, of

these factors are supported by the record evidence.  Accordingly, the Court finds that Defendant is entitled to a judgment of acquittal on this Count.

> **e.**      **Counts Eight (Possession of Heroin, Morphine, Oxycodoneo and Hydromorphone), Nine (Possession of Heroin, Marihuana, 3, 4, Methylenedioxymethamphetamine, Morphine, Oxycodonoe, Hydromorphone, Cocaine, and Fentanyl), and Ten (Possession of Morphine)**

Defendant seeks dismissal of Counts Eight, Nine, and Ten based "on the record as it already exists, and the credibility issues" previously identified.  As previously discussed, the credibility issues were brought to the jury's attention and the jury made the necessary credibility determination.  The Court sees no basis upon which to afford any relief with respect to these Counts.

> **f.**      **Other Claimed Bases for Relief**

> > **1.**      **Severance**

Defendant next seeks post-trial relief on the ground that the Court should have severed Counts Four, Five and Six from the remaining Counts.  This request is denied for the reasons stated by the Court on June 14, 2007 and again in its decision and order dated July 11, 2007.

> > **2.**      **Discovery Violations**

> > > **a. Rule 16**

Defendant claims that the government failed to fulfill its obligation to provide a written summary of expert testimony that it intended to use at trial.  Specifically, Defendant claims that he never received a summary of Dr. Robert Middleberg's proposed expert testimony.  Defendant contends that he had no advanced knowledge that Dr. Middleberg

- 9 -

would testify that hydromorphone is a metabolite of morphine.  Defendant claims that he was surprised by this testimony.  This was significant to Defendant because part of his defense was that hydromorphone was only found in Corbin Douglas, Jr. and Kalin Richards and, therefore, it must have been Richards (and not Defendant) who distributed the hydromorphone to Corbin Douglas, Jr. by administering Dilaudid to Corbin Douglas, Jr. The government responds that it provided Defendant with all materials relating to Dr. Middleberg's testing, analysis, findings, conclusions and testimony.  The government further argues that any Rule 16 violation was harmless because "[a]t the time of Dr. Middleberg's direct testimony . . . defendant was provided with a copy of the five page study that Dr. Middleberg referenced in his testimony regarding this issue.  Additionally, the defendant was given an opportunity to review the document prior to cross-examination continuing."  The government further notes that Defendant never re-called Dr. Middleberg concerning this testimony, Defendant had an opportunity during the course of trial to investigate this issue with his own expert, and Defendant chose not to present any expert testimony on the issue.

Rule 16(a)(1)(G) provides that "[a]t the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  See also United States v. Dukagjini, 326 F.3d 45, 56 (2d Cir. 2003).  Although the government provided Defendant with all the materials supporting Dr. Middleberg's testimony, it appears that it did not provide the requisite written summary of the witness's opinions.

The question, then, is whether the failure to provide the information required by Rule 16(a)(1)(G) requires a new trial.  For the following reasons, the Court finds that it does not.  First, "the government's duty to disclose a summary of expert testimony is not triggered unless the defendant requests such a summary."  United States v. Cruz, 363 F.3d 187, 196 n. 2 (citing Rule 16(a)(1)(G)).  Defendant has not provided any information suggesting that it requested such a written summary.  Without evidence of such a request, the Court is unable to conclude that the government violated Rule 16.

Second, and related to the first point, the government notified Defendant of its intention to call Dr. Middleberg and supplied Defendant with the data backing up Dr. Middleberg's testimony.[2]  Nothwithstanding his knowledge that Dr. Middleberg likely would testify on behalf of the government, there is no indication that Defendant requested a written summary of his testimony.

Third, assuming the government violated Rule 16, Defendant was permitted the opportunity to examine Dr. Middleberg concerning his qualifications to testify in the field of forensic toxicology.  Tr. at 118-19.  Defendant indicated that he had no objections to Dr. Middleberg's qualifications and, therefore, the Court permitted him to testify to questions relevant to his area of expertise.  Tr. at 121-22.

Fourth, after Dr. Middleberg testified that "a study came out last year that demonstrates that hydromorphone is a - is a by-product or metabolite. . . . Something that a compound breaks down to in our body of morphine,"  Tr. at 143-44, the Court allowed Defendant additional time to prepare for the cross-examination of  Dr. Middleberg.  When

---

[2] It does not appear that the government supplied the study about which Dr. Middleburg testified at trial.

Defendant argued that he did not have sufficient information concerning the study, the Court granted Defendant's request for "an opportunity to review and consider the study he's talking about before I cross-examine him."  Tr. at 151.  The Court stated that "I'm going to let you take time now, when [the prosecution] is finished with this expert, to look at the study he talked about, that is something you didn't know about before, to see what it says and use it however you want on cross-examining the witness."  Tr. at 153.  Defense counsel did, in fact, review the report upon which Dr. Middleberg's testimony was based prior to conducting cross-examination.  Tr. at 168.

Fifth, Defendant did not request additional time to investigate the study, did not request time to obtain an expert to review the study, and chose not to call his previously retained expert to testify concerning the study.  Further, although Dr. Middleberg was under a defense subpoena, he was never recalled by Defendant to give additional testimony concerning the study.

Sixth, Defense counsel effectively cross-examined Dr. Middleberg on whether the study was peer-reviewed, subjected to any kind of error rate testing, and otherwise attacked the study and its applicability to Corbin Douglas, Jr.  Defense counsel then sought to strike "Dr. Middleberg's opinion with respect to where hydromorphone comes from or could have come from." the  Tr. at 168-71.  The Court denied the objection and noted that "[t]he jury can consider what was just elicited on cross-examination, in it's examination of how to treat the doctor's testimony with respect to the topic of morphine metabolizing into hydromorphone. . . ."  Id. at 171.  At the end of the case, the Court instructed the jury that:

> Merely because these [expert] witnesses were allowed to testify and
> express opinions and conclusions does not mean . . . that you must
> accept their testimony.  You should judge their testimony like the

testimony of any other witness.  You may accept it or reject it and give it as much weight as you think it deserves, considering each witness' training and experience, the soundness of the reasons given for his opinion, and all other evidence in the case.  The testimony is entitled to no special treatment or consideration.  It does not have any greater or lesser weight.  All witnesses who take the stand are subject to the same rules and tests regarding, for example, credibility, bias, and interest in the outcome.  You may consider the soundness of the reasons given for each witness' opinion and the methods by which each witness reached his conclusions; it is entitled to such weight as you find the witness' qualifications in the field warrant but is not controlling upon your judgment.

Tr. at 1169.  Thus, the jury was presented with the evidence and advised that it was up to it whether to credit Dr. Middleberg's testimony.

Seventh, notwithstanding Dr. Middlberg's testimony concerning the study, Defendant was able to present his defense that Kallin Richards gave Dilaudid to Corbin Douglas, Jr., and, therefore, he (and not Defendant) was the source of the hydromorphone found in Corbin Douglas, Jr.  Indeed, Dr. Middleberg testified that he could not rule out exposure to hydromorphone directly from Dilaudid (as opposed to hydromorphone being found in the body as a metabolite of morphine).  Tr. at 142, 167.  It was up to the jury to determine whether to believe the study testified to by Dr. Middleberg and whether the hydromorphone found in Corbin Douglas, Jr. came from Dilaudid administered by Kallin Richards or morphine administered by Defendant.

Eighth, to convict Defendant on Counts Four and Five (the Counts most affected by the claimed Rule 16 violation), the government needed to prove beyond a reasonable doubt that Defendant distributed Heroin, Morphine, Oxycodone, _**or**_ Hydromorphone to a Minor (Count Four) and that Defendant Distributed Morphine _**or**_ Hydromorphone which resulted in death (Count Five).  The government needed to prove that Defendant distributed any one

(and not all) of the drugs listed in Count Four and that the distribution of any one (and not all) of the drugs listed in Count Five resulted in the death of Corbin Douglas, Jr.  This is because "[a]n indictment may charge alternate ways of violating a statute in the conjunctive, and a conviction under such an indictment will be sustained if the evidence justifies a finding that the statute was violated in any of the ways alleged."  United States v. Astolas, 487 F.2d 275, 280 (2d Cir. 1973); see United States v. Schiff, 801 F.2d 108, 114 (2d Cir. 1986) ("It appears settled that indictments worded in the conjunctive, charging violations of statutes worded in the disjunctive, can be supported by proof of either of the conjoined means of violating the act.") (quotations and citation omitted).  Thus, for the reasons previously discussed, the jury could have entirely disregarded the trial testimony concerning the source of the hydromorphone and still concluded beyond a reasonable doubt that Defendant distributed morphine to Corbin Douglas, Jr. (Count Four) that caused Corbin Douglas, Jr.'s death (Count Five).

Ninth, and for reasons similar to the eighth point previously discussed, the jury could have accepted Defendant's argument and concluded that Kallin Richards was the source of the hydromorphone in Corbin Douglas, Jr., but that Defendant was the source of the morphine in the child and that it was the morphine that caused death.

### b. Failure to Turn Over Recorded Statements

Defendant next contends that the government failed to turn over his taped statements.  The taped statements consist of telephone conversations between Defendant and his mother, Gretchen Douglas, that were recorded by the penal institution in which Defendant was incarcerated prior to trial.  The government used these conversations at trial to demonstrate that Defendant's mother was providing untruthful trial testimony.  The

government contends that these tapes are not subject to Rule 16 because they were not part of the underlying investigation or prosecution, they are not related to any counts in the Indictment, the recordings were made pursuant to standard operating procedures at the county jail, and they were not introduced into evidence, but merely used to cross-examine a hostile witness.

Rule 16(a)(1)(B) requires the government to disclose "any relevant written or recorded statement by the defendant if the statement is within the government's possession, custody, or control; and the attorney for the government knows - or through due diligence could know - that the statement exists."  "The duty of disclosure continues throughout the trial, requiring the government to disclose material to the defense 'promptly'- that is, as soon as the prosecutor becomes aware of it."  United States v. Thomas, 239 F.3d 163, 166 (2d Cir. 2001).  "Rule 16 obliges the government to produce any relevant written or recorded statements made by the defendant, giving a defendant virtually an absolute right to his own statements."  Id. (internal quotations and citations omitted).  While it appears clear that the government had in its possession a statement made by the Defendant and that the government knew about the statement, the questions that arise are: (1) whether the recorded statement is "relevant;" and (2) if so, whether the failure to disclose caused Defendant substantial prejudice.  Id. at 167.

The Court need not determine whether the recorded statements were relevant because Defendant fails to demonstrate substantial prejudice.  Whether there has been substantial prejudice requires consideration of "'the nature of the evidence sought, the extent to which it bore on critical issues in the case, the reason for its nonproduction, and the

strength of the government's untainted proof,' as well as timing of production." Id. (quoting

United States v. Stevens, 985 F.2d 1175, 1181 (2d Cir. 1993).

In his moving papers, Defendant fails to articulate substantial prejudice resulting

from the non-disclosure.  Having reviewed the record, the Court finds that there was no such

prejudice.  The recorded statements at issue here was not used for purposes of

demonstrating Defendant's guilt.  Similarly, the statements did not bear on critical issues in

the case.  Rather, as this Court plainly instructed the jury, its use was limited to impeaching

the testimony of Defendant's mother.  Tr. at 506-07, 511.  The government had ample

"untained proof" in support of the conviction.

### 3.    Brady Violations

Defendant next contends that the government violated the Brady rule by failing to

turn over the admissions Elicia Longcor made to the government that she lied in previous

proceedings.  The government responds that "[t]he government turned over in discovery all

statements made by all witnesses, including Elicia Longcor. . . ."  Def. Mem. of Law at 45.  In

his reply memorandum of law, Defendant does not refute the government's contention that it

supplied all of Elicia Longcor's statements.  The Court has no reason to believe that the

government did not turn over Elicia Longcor's statements.

### g.    Prosecutorial Misconduct

Defendant also contends that the government engaged in various forms of

prosecutorial misconduct.  Defendant argues that the prosecutor made numerous comments

during his summation "intentionally suggesting the existence of evidence that was not part of

the record and intentionally misstating evidence that was in the record. . . ."  Def.'s Mem. of

Law at 23.  The initial claimed prejudicial statements pertain to the prosecutor's statements

regarding why, or under what circumstances, witnesses may be offered immunity.  After

Defense counsel argued that various witnesses were incredible because, among other

things, they were granted immunity, the prosecution responded as follows:

> Immunity. I am not going to apologize for any immunity given to any
> witness by the government. And the Judge will tell you we have the right
> to decide who and when and what to give immunity to.  You know what,
> folks, you may not like that but this is the real world.  At times when you're
> dealing with people who they, themselves, may have been involved in
> criminal conduct or using drugs, distributing drugs, possessing drugs, you
> have to get to the bottom line. . . .
>
> I'm not going to stand here and apologize or explain to you because it will
> take us – here's the finer points of the criminal justice system, the FBI and
> the Department of Justice and how we go about getting crimes solved.
> But I'm telling you this is a fact of life.... It's a tool that is utilized in order to
> solve cases and that's what was done here. The defendant had the
> motive, biggest motive of anybody.

Tr. at 1154-55.

Defendant contends that these statements "prevented the jury from scrutinizing the credibility

of those witnesses even on other grounds, such as prior inconsistent statements, bias, etc."

Def.'s Mem. of Law at 25.

        The Court does not believe that these statements by the prosecutor amounted to

misconduct.  Defense counsel attacked the credibility of various witnesses based on their

grants of immunity.  The prosecution was entitled to respond to those claims and inform the

jury that it is within the government's discretion whether to afford a witness immunity.

Moreover, any prejudice to Defendant was cured by the Court's instructions to the jury.  This

Court carefully explained to the jury as follows:

> You also heard testimony from witnesses who testified under a grant of
> immunity from a court or from the government. This means that the
> testimony of the witness may not be used against him or her in any
> criminal case, except for a prosecution for perjury, giving false

statements, or otherwise failing to comply with an order of the Court. You are instructed that the government is entitled to call as a witness or anyone is entitled to call as a witness a person who has been granted immunity and you may convict a defendant on the basis of such a witness' testimony alone if you find that the testimony proves the defendant guilty beyond a reasonable doubt.

However, the testimony of a witness who has been granted immunity should be examined by you with greater care than the testimony of an ordinary witness. You should scrutinize it closely to determine whether or not it is colored in such a way as to place guilt upon the defendant in order to further the witness' own interest; for, such a witness, confronted with the realization that he or she can win freedom by helping to convict another, has a motive to falsify his or her testimony. Such testimony should be scrutinized by you with greater care and you should act upon it with caution. If you believe it to be true, and determine to accept the testimony, you may give it such weight, if any, you believe it deserves.

Tr. at 1167-68. Accordingly, the Court advised the jury that it should carefully examine testimony given by a witness under immunity because such immunity may give the witness a reason (or motive) to be untruthful. In its instructions, the Court made no distinctions regarding the credibility of a witness testifying under immunity based on the reasons why the witness was given immunity. Contrary to Defendant's claim, the Court further instructed the jury to pay attention to other matters affecting the credibility of any witness, including prior inconsistent statements, bias, etc. Tr. at 1165-1167.

Defendant next argues that the prosecutor improperly commented about the substance of Defendant's telephone statements not in evidence. This argument pertains to the recorded telephone calls used by the prosecution to impeach Defendant's mother. The Court does not find any impropriety by the government. The entirety of the government's summation makes it clear that it was arguing that Gretchen Douglas provided false testimony and she had reason to lie based upon telephone calls she had with Defendant. The government was not attempting to introduce Defendant's statements into evidence in support

of the elements of the charged offenses, but was using Defendant's statements to show that Gretchen Douglas had a motive and opportunity to give false testimony.

Defendant next claims that the prosecutor improperly convinced the jury that the government had reviewed certain pharmacy records without any supporting evidence. According to Defendant, this statement seriously impaired its "inference defense" "that law enforcement did not lift a finger to obtain pharmacy records that absolutely refuted the testimony of the witness upon whose credibility counts 1 and 6 were entirely based. . . ." Def.'s Mem. of Law at 30.

The Court does not find that the prosecution engaged in misconduct.  What the prosecution said was "[d]on't assume anything.  Don't assume that those [pharmacy] records weren't looked at.  Don't assume that State Police didn't look at them.  What I'm saying to you is they confirm exactly what we said to you."  Tr. at 1151.  There is nothing improper about the prosecution advising the jury not to make assumptions.  Moreover, the prosecution was entitled to explain to the jury its view of the evidence and suggest that Chelsea Richheimer's memory concerning the timing of the filling of the Zyprexa prescription was not exact, but approximate and, therefore, consistent with the pharmacy records.  Further, any prejudice resulting from these statements is ameliorated by the fact that the Court has granted Rule 29 relief with respect to Count Six (the Count most likely affected by this claimed misconduct).

Next, Defendant argues that the prosecution improperly stated that Defendant and his family destroyed evidence without any evidentiary support.  This argument must be rejected because there was evidence in the record suggesting that members of Defendant's family were the first to arrive on the scene and, thus, may have had an opportunity to destroy

evidence.  Kallin Richards testified that "[t]he first people to show up were his parents,

Gretchen and Cecil and Jessica."  Tr. at 773.

 Lastly, Defendant argues that the prosecutor acted improperly by "suggesting to the

jury that the prosecution tried to provide information about abuse [of Elicia Longcor] that it

should have been allowed to hear, and it was the defense that deprived the jury of that

information."  Def. Mem. of Law at 34.  The Court does not find any impropriety.  On

summation, Defendant argued that, other than the testimony of Elicia Longcor, there was no

evidence that she was abused.  In the government's rebuttal, it attempted to respond to the

defendant's argument by stating:

> The defense a few moments ago talked to you about Elicia and the
> physical abuse and the defense said to you that other than Elicia, there is
> no other evidence and none was produced of physical abuse.  And that
> nobody else talked about physical abuse of Elicia.  Do you remember
> when the defense called Shannon Longcor and do you remember when I
> cross-examined Shannon Longcor about being at the defendant's?

Tr. at 1140.  At that point, the defense objected to the prosecution trying to "suggest that a

question that he asked that was objectionable was somehow indicative of something about

the lack of evidence or efforts by the defense to prevent evidence of abuse being put in front

of the jury."  Tr. at 1141.  The Court agreed with Defendant and ruled that the prosecution

could respond to the Defendant's argument "but if that includes saying I tried to ask

questions about abuse and the defense stopped me, that's improper. . . . [T]he questions are

not evidence.  The answers to the questions are evidence. . . . You can't just ask questions

about objections that were sustained.  That's all."  Tr. at 1144-45.

 Thereafter, the government continued to state as follows:

> You know what, folks, I'm going to leave it to you to remember who asked
> what questions of all the witnesses here and I'm going to leave it to you in

> your judgment to figure out who it is that's making things up or trying to
> lead you in the wrong direction.  I think you folks have a pretty good
> sense of the testimony and who was trying to elicit what testimony.

Tr. at 1146.  There was no objection to these latter statements.  In any event, the Court does

not find that this was misconduct or this it requires a new trial.  The government did not

reference any specific questions he asked, or objections made by Defendant, but simply

informed the jury that it would leave it up to them to remember who asked what questions,

who is making things up, and who is trying to lead the jury in the wrong direction.  The

prosecutor never suggested that either the Court or Defendant prevented the government

from eliciting certain testimony.

## III.      CONCLUSION

      For the foregoing reasons, Defendant's Rule 33 motion is DENIED in its entirety.

Defendant's Rule 29 motion is GRANTED IN PART and DENIED IN PART.  The Rule 29

motion is granted insofar as the conviction on Count 6 must be vacated because no rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

In all other respects, the Rule 29 motion is DENIED.

IT IS SO ORDERED.

Dated:October 24, 2007

Thomas J. McAvoy
Senior, U.S. District Judge